No. 79-93

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

---

THE GREAT FALLS TRIBUNE, a corporation,

Petitioner,

-vs-

THE DISTRICT COURT OF THE EIGHTH
JUDICIAL DISTRICT OF THE STATE OF MONTANA,
et al.,

Respondents.

---

ORIGINAL PROCEEDING:

Counsel of Record:

For Petitioner:

Swanberg, Koby, Swanberg and Matteucci, Great Falls,
Montana
Randall Swanberg argued, Great Falls, Montana

For Respondents:

J. Fred Bourdeau, County Attorney, Great Falls, Montana
Robert J. Vermillion argued, Deputy County Attorney,
Great Falls, Montana
Judge H. William Coder argued, Great Falls, Montana
Daniel Donovan argued, Montana Defenders Project, Great
Falls, Montana
James A. Lewis argued, Montana Defenders Project, Great
Falls, Montana

---

Submitted: January 17, 1980

Decided: MAR 19 1980

Filed: MAR 19 1980

_Thomas J. Kearney_
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

The question before this Court is whether the District Court's order closing to the press and public the individual voir dire examination of prospective jurors in a criminal case should be affirmed under the circumstances of this case. Our order of January 18, 1980, vacated the closure and directed that the press and public be permitted to attend the voir dire examination with a written opinion to follow. This opinion constitutes the reasons for our decision.

Gene Andrew Austad was charged with two counts of deliberate homicide, robbery, sexual intercourse without consent, and aggravated burglary allegedly committed on April 21, 1978.

His preliminary hearing could not be held until September 18, 1978, because of injuries he sustained in an accident following the crimes with which he was charged. Shortly after the alleged and as yet undiscovered crimes with which he was later charged, Austad was stopped by Great Falls police for a traffic violation, fled the scene of the traffic stop, and a high speed chase ensued culminating in a wreck in which he was severely injured. Following the wreck, authorities discovered evidence of the commission of other offenses which led to the discovery of the body of Mabel Wald, age 69, the victim of the crimes of which Austad was charged.

Following the preliminary hearing, Austad was bound over to the District Court of Cascade County. On October 18, 1978, the District Court denied his motion for an order controlling alleged prejudicial publicity.

Austad was arraigned on December 27, remained silent, and a not guilty plea to all charges was entered in his behalf.

In February, 1979, Austad was released from the hospital. His bail was reduced permitting him to be taken to the home of his parents to be given the personal care required by his condition.

- 2 -

On May 31 the defendant filed a motion for change of place of trial. On June 1 he moved for sequestration of prospective jurors during voir dire examination and during trial. On June 4 defendant moved for individual voir dire examination of prospective jurors.

On August 24 following a psychiatric and medical examination of defendant to determine his fitness to proceed, an in camera hearing was held by the District Court in its chambers to determine defendant's fitness to proceed to trial, his ability to assist and communicate with his counsel, and the extent to which the State's evidence could be reconstructed.

On October 2 the District Court found that defendant's physical condition made it possible for him to proceed to trial with certain limitations and set a trial date of November 20.

On October 15 defendant moved to close pretrial proceedings.

On November 1, following a hearing closed to the press and public, the District Court entered orders denying defendant's motion to dismiss for prosecutorial misconduct and granting defendant's motion to close pretrial proceedings calendered for October 29 to the press and public.

The trial was continued to December 3 at which time an initial panel of 50 prospective jurors were sworn. At the commencement of voir dire examination, the District Court directed that the individual voir dire examination of prospective jurors be closed to the press and public.

On December 14, the Great Falls Tribune filed an original proceeding in this Court seeking a writ of supervisory control (1) directing the presiding judge to permit a Tribune reporter to attend and observe the voir dire examination of prospective jurors, and (2) directing the presiding judge to hold a hearing and thereafter issue findings of fact and conclusions of law showing that

defendant's right to a fair trial was jeopardized.

On the same date this Court issued an order directing the presiding judge to hold a hearing and submit to us his findings and conclusions concerning his reasons for closing the voir dire examination to the press and public and staying further proceedings in jury selection.

On January 10, 1980 following hearing, the presiding judge filed his findings, conclusions and order closing the voir dire examination to the press and public. In summary, the presiding judge concluded that such closure was required to ensure the right of the defendant to a speedy public trial by an impartial jury in Cascade County. The closure was based upon findings of substantial prejudicial publicity, misstatements of fact, disclosure of defendant's prior criminal record, and disclosure of evidence not generally known to the public originating in part from the prosecution and police appearing in the Tribune. The presiding judge examined certain alternatives to closure--sequestration of prospective jurors, change of venue, and continuance of trial to a later date--and rejected each for various reasons.

Defendant filed a motion to dismiss this proceeding which we denied. Briefs were filed by defendant, the State and the Tribune. Oral argument was heard on January 18. Thereafter this Court entered an order vacating the closure with a full written opinion to follow as time permitted.

We do not have a transcript of the District Court hearing as time would not permit its preparation prior to hearing. However, we do have 92 exhibits filed by the Tribune and defendant relating to press coverage including news items in the Tribune, letters to the editor printed in the Tribune, and scripts of radio-television broadcasts. They cover the time period from April 23, 1978 to December 14, 1979. In short, they depict a murder in which

- 4 -

a 29 year old defendant is alleged to have raped a 69 year old victim, cut her throat, and stuck a knife in her chest; his fleeing from police in an automobile chase at speeds up to 89 miles per hour after being stopped for a routine traffic investigation; and reporting subsequent events in the criminal prosecution with republication of events leading to defendant's arrest and the charges filed.

At the outset we observe the existence of a common law rule of open civil and criminal proceedings in the courts of this country. Gannett Co., Inc. v. DePasquale (1979), ____U.S.____, 99 S.Ct. 2898, 61 L Ed 2d 608 and authorities cited therein. The public and the press have "traditionally had access to criminal proceedings and history supports the notion that public trials are the norm." Rapid City Journal Company v. Circuit Court (1979), ____S.D.____, 283 N.W.2d 563; Gannett v. DePasquale, supra, and cases cited therein.

We additionally note that the United States Supreme Court has ruled that the Federal Constitution does not require that a pretrial hearing on a motion to suppress evidence be open to the public and that the press has no federal constitutional right of access to such a proceeding. Gannett Co. v. DePasquale, supra.

However, the situation is considerably different under the Constitution of this State. Article II, Section 9 of the 1972 Montana Constitution provides:

> "Section 9.  Right to know.  No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure." (Emphasis added.)

The language of this provision speaks for itself. It applies to all persons and all public bodies of the state and its subdivisions without exception. Under such circumstances, it is our duty to interpret the intent of the framers from the language of the provision alone and not to resort to extrinsic aids or rules of

construction in determining the intent of the delegates to the
Constitutional Convention. Keller v. Smith (1976), 170 Mont.
399, 404, 554 P.2d 1002; Cashmere v. Anderson (1972), 160 Mont.
175, 500 P.2d 921, cert.den. 410 U.S. 931, 93 S.Ct. 1372, 35
L Ed 2d 593; Vaughn & Ragsdale Co. v. State Board of Equal. (1932),
109 Mont. 52, 96 P.2d 420; Sections 1-2-102 and 1-4-103, MCA.
Art. II, Sec. 9 clearly provides that any person has the consti-
tutional right to observe court proceedings unless the demand of
individual privacy clearly exceeds the merits of public disclosure.

The merits of public access to criminal proceedings are
many and substantial. It protects the accused from "secret in-
quisitional techniques" and unjust persecution by public officials
and "goes far toward insuring him a fair trial, to which he is
entitled." Westchester Rockland Newspapers v. Leggett (1979),
423 NYS2d 630, and cases cited therein. It promotes justice for
the accuser as well--the police and prosecutors who must enforce
the law and the victims of crime who suffer when the law is not
enforced fairly, impartially and vigorously. Westchester Richland
Newspaper, supra. Open public proceedings have long been recog-
nized as a cornerstone in preserving the quality and integrity
of the judicial process. Rapid City Journal Co. v. Circuit Court,
supra. Closure of judicial proceedings breeds suspicion and mis-
trust in the minds of the public and respresentatives of the media.
Such closure is simply censorship at the source--a denial of the
right to know. Frequently it is counterproductive; it focuses
public attention on the accused and the crime by generating publicity
which neither would otherwise merit.

However, this right of access or right to know is not ab-
solute. Our Montana Constitution provides an exception in cases
where the demand of individual privacy clearly exceeds the merits
of public disclosure. It also guarantees the defendant the right
to a speedy public trial by an impartial jury. Art. II, Sec. 24,

1972 Montana Constitution. A balancing of these competing rights is required.

We proceed to analyze this case in this context. We have examined the 92 exhibits of pretrial media coverage. We note that the Tribune has published and republished the background of the case--that defendant is charged with raping and murdering the 69 year old victim, cutting her throat, sticking a knife in her chest and subsequently being apprehended by police after a high speed chase. Television and radio broadcasts are of the same tenor. In our view these items are factual reporting without editorializing and are no more inflammatory than background information on any other brutal crime. One article appeared in the Tribune tending to link defendant with a house burglary five years earlier. This article appeared five to six days after the crime and one and a half years before jury selection. The District Court found that the news articles contained misstatements of fact giving as an example the implication that the high speed chase by police resulted from defendant's fleeing the scene of the crimes rather than fleeing from a routine traffic investigation.

We find nothing in the news articles, in the scripts of radio and television broadcasts, or in subjecting the prospective jurors to an open and public voir dire examination that would deny or impair defendant's right to a speedy public trial by an impartial jury under Federal and State Constitutional guarantees. No contention is made that the publicity in this case was massive or pervading to the extent of exerting an influence upon jurors to insure a conviction as in Sheppard v. Maxwell (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L Ed 2d 600 or Estes v. Texas (1965), 381 U.S. 532, 85 S.Ct. 1628, 14 L Ed 2d 543.

In the modern world it is impossible to create an artificial, antiseptic environment from which prospective jurors may

be drawn who have heard nothing of a serious crime committed in their midst. People read newspapers. They listen to radio and television newscasts. It is only where they form fixed opinions on the guilt or innocence of the defendant which they would not be able to lay aside and render a verdict based solely on the evidence presented in court that they become disqualified as jurors. Irvin v. Dowd (1961), 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L Ed 2d 751, 756; State v. Lewis (1976), 169 Mont. 290, 546 P.2d 518. A probing voir dire examination of prospective jurors is the judicial mechanism for determining this. The purpose of voir dire in a criminal proceeding is to determine the existence of bias and prejudice on the part of prospective jurors and to enable counsel to intelligently exercise his peremptory challenges. State v. Stuit (1978), ____Mont.____, 576 P.2d 264, 35 St.Rep. 313. In this case separate, segregated and individual voir dire of prospective jurors was ordered by the Court, but we fail to see just how closing such examination to the public is necessary to guarantee the defendant a fair trial. If during the course of voir dire it should become necessary to allude to inadmissible evidence or similar matters, the presiding judge could briefly close the voir dire for those questions and answers alone, an alternative not considered by the court in this case.

From the foregoing it is apparent that the Montana Constitution imposes a stricter standard in order to authorize closure than does the United States Constitution. Art. II, Sec. 9 of the Montana Constitution has no counterpart in the Federal Constitution. In Gannett the United States Supreme Court left open the question of whether a stricter state constitutional standard is permissible under the Federal Constitution.

> " . . . But we are not asked here to declare whether open proceedings represent beneficial social policy, or whether there would be a constitutional barrier to a state law that imposed

- 8 -

a stricter standard of closure than the one here employed by the New York count . . ." _____ U.S. at _____ , 99 S.Ct. at 2912-2913, 61 L Ed 2d at 630.

We note that <u>Gannett</u> is distinguishable from the present case. <u>Gannett</u> involved closure of a pretrial suppression hearing; this case involves closure of the entire voir dire examination of all prospective jurors. In our view pretrial suppression hearings involve a special risk, i.e. disclosure of tainted evidence. Although it is not entirely clear, there is reason to believe that the holding in <u>Gannett</u> may not be applicable to closure of the trial itself. Here the voir dire examination is an integral part of the trial itself. See Commercial Printing Co. v. Lee (Ark. 1977), 553 S.W.2d 270; 21 Am Jur 2d, Criminal Law §260; United States v. Woods (3rd Cir. 1966), 364 F.2d 481. Closing any part of the trial is simply the first step down that primrose path that leads to destruction of those societal values that open, public trials promote. Nothing short of strict and irreparable necessity to ensure defendant's right to a fair trial should suffice.

These are the reasons for our order of January 18, 1980, vacating the closure of the voir dire examination and directing that the press and public be permitted to attend.

_____
Chief Justice

We concur:

_____

_____
Justices

- 9 -

Mr. Justice John C. Sheehy dissenting:

On January 18, 1980, the majority of this Court entered its per curiam order directing the respondent District Court to proceed forthwith with voir dire examination of prospective trial jurors in the criminal case against Gene Andrew Austad, and vacating an earlier order of the District Court that the press and public be excluded from such voir dire examination.

We dissented to that order and now state our reasons.

We have no testimonial record before us in this case. Such facts as may be recited here are gleaned from the allegations in the petition, the responses thereto, and the exhibits which have been filed. What we say here respecting the purported facts is not to be construed in any present or future proceedings as an indication by us that we have prejudged what the facts may eventually turn out to be.

On April 27, 1978, an information was filed in the District Court, Eighth Judicial District, Cascade County, against Gene Andrew Austad. He was charged with five felonies, alleged to have been committed on April 21, 1978 in Great Falls, including two counts of deliberate homicide, and one each of robbery, sexual intercourse without consent, and aggravated burglary.

In the early morning hours of April 22, 1978, Austad suffered severe injuries to his person as a result of an accident in or near Great Falls, which occurred while Austad was engaged in a high-speed chase between an automobile he was driving and one operated by the Great Falls police. He had been stopped for a traffic violation investigation, attempted to leave the scene, and the chase ensued. Following the accident in which Austad was injured, the authorities

discovered evidence of the commission of another offense, and the subsequent investigation of this possible offense led to the discovery of the body of Mabel Wald then aged 69, the victim of the offenses charged against Austad in the information above detailed.

Because of the injuries which Austad received in the accident, he was hospitalized in Great Falls. His condition was such that a preliminary hearing in the criminal case against him was not had until September 18, 1978. On October 4, 1978, the defendant, through his counsel from the public defenders office filed a motion for an order to control prejudicial publicity. That motion was denied by the District Court on October 18, 1978, the court then finding that the pretrial coverage by the press had not prejudiced the defendant.

Austad was arraigned on December 27, 1978, remained silent, and the court entered his plea of not guilty to all of the charges. Since there was a question as to the physical fitness of the accused to proceed, the District Court directed his psychiatric and medical examination.

In early February, 1979, Austad was released from the hospital. The District Court reduced his bail so that he could be taken to the home of his parents and be given the personal care required by his then physical condition.

On May 31, 1979, defendant filed a motion for change of place of trial. On June 1, 1979, defendant filed a motion for the sequestration of jurors during voir dire examination and during trial. On June 4, 1979, the defendant moved for individual voir dire examination of the prospective jurors, which latter motion was granted by the court.

-11-

On July 9, 1979, the District Court ordered memoranda from all parties and from the State and defendant's counsel to advise him on the question of defendant's fitness to proceed relating to the issues of his ability to be of assistance to his counsel and to communicate with him; the extent to which the State's evidence could be reconstructed, not only as to the offense itself, but as to the possibility of the defense of alibi; and for any further comment on the psychiatric, medical and neurological reports which the court had received. A hearing on this order was held on August 24, 1979 in chambers before the court in camera.

On October 2, 1979, the court made findings determining that the defendant's physical condition made it possible for him to proceed to trial with certain limitations, and ordered jury trial to commence on November 26, 1979. He further set all pending motions for decision on October 29, 1979. On October 15, 1979, Austad moved to close the pretrial proceedings.

On October 29, 1979, the hearing was closed to the press and public, and thereafter, on November 1, 1979, the District Court made the following orders:

(a) Denied Austad's motion for funds to hire a professional survey team to conduct a telephone survey in Great Falls regarding the Gene Austad case.

(b) Denied various motions of the defendant to dismiss on grounds of misconduct of the prosecution.

(c) Granted defendant's motion to close proceedings to the press and public.

The jury trial date was continued to December 3, 1979 and on that date, an initial panel of 50 jurors were sworn. The court determined that examination of the prospective

jurors would be individual, and then released the jury panel until further call of the court.

On December 4, 1979, at the beginning of voir dire, the court directed that the individual voir dire examination of the prospective jurors be closed to the public and the press.

On December 14, 1979, the Great Falls Tribune filed with this Court a petition for a writ of supervisory control directing the Honorable H. William Coder to permit a Tribune representative to attend the voir dire proceeding, or in the alternative, to hold a hearing and enter findings and conclusions which would show that the defendant's right to a fair trial was jeopardized.

When the Tribune filed its petition, voir dire examination of the jurors in the Austad trial was then under way. On the same date as the petition was filed, we issued an order staying all further proceedings in the Austad trial, and directed Judge Coder to hold a hearing and to submit to us findings of fact and conclusions of law as to his reasons for closing the trial proceedings to the press and public.

The hearing has been provided by the District Court. On January 10, 1980, the District Court filed its findings of fact and conclusions of law and order. In summary, Judge Coder concluded that the right of the accused, Austad, to a speedy public trial by an impartial jury in Cascade County required individual voir dire examination of the prospective jurors closed to the press and public until such time as the jurors and alternates are duly sworn and empaneled.

Counsel for Austad filed a motion to dismiss these proceedings on December 18, 1979. The Tribune filed its objection to said motion. The Cascade County Attorney has

also filed a brief in this matter. We ordered oral argument on the findings of fact and conclusions of law submitted by the District Court to be held before us on January 18, 1980.

The position of the Tribune had not been changed, that no reason existed for the exclusion of the press and public from the voir dire examination of the prospective jurors in the criminal trial. The position of the County Attorney is that he would not attack the order of the district judge and so he took no position pro or con as to the order. The position of counsel for Austad, while supportive of the district judge, indicates rather strongly that they would prefer that the trial of Austad be moved to another county. Judge Coder himself, as a named respondent in this action, appeared and argued in support of the order that he issued.

The foregoing recapitulation summarizes the proceedings had in the District Court and before this Court that led to our order of January 18, 1980 vacating the closure stricture imposed by the District Court.

We believe from the materials before us that Gene Andrew Austad, age 29 at the time of the crimes charged against him, is a Great Falls resident who is severely physically incapacitated. He sustained closed-head injuries which have resulted in retrograde and anterograde amnesia which is permanent; dysarthia, that is difficulty with speech due to the weakness of his voice muscles; double vision; spastic quadraparesis, which necessitates the use of a wheelchair although he is able to stand and walk very short distances with the assistance of two aides; and a mild degree of diffuse cerebral dysfunction. The District Court found that in spite of his amnesia, which relates particularly to the incidents involving the crimes charged, he is

nevertheless mentally able to attend trial. He communicates in some degree with his counsel so that he is able to aid in his own defense; but his physical condition is such that he would not be able to be present in the courtroom for an entire day. Therefore, the trial is scheduled to be conducted on a part-day basis and is "programmed" for 8 weeks.

Defendant's counsel has filed in the District Court 92 exhibits relating to press coverage of the defendant and his trial. They include news items running in the Great Falls Tribune, scripts of television broadcasts relating to Austad, and letters to the editor printed in the Tribune. In short, they depict a murder in which the 29 year old defendant is alleged to have raped a 69 year old woman, and then murdered her by cutting her throat and sticking a butcher knife in her chest; his fleeing from the police in the high speed auto chase at speeds up to 89 miles per hour; the termination of the chase when the Austad vehicle ran into 9 parked automobiles at a Great Falls auto dealership; his subsequent confinement to the hospital for several months before he was able to be arraigned. There is no need to embellish those facts for a sensational effect. Their very recitation arouses a vindictive ire in the reader's mind.

No playwright, not Shakespeare himself, could devise a scene more packed with high drama in a constitutional face-off than is presented here. On the one hand, the press, towering and majestic, robed in the First and Fourteenth Amendments. On the other, the defendant, cowering and pathetic, crippled and charged as despicable, uncomfortable in the poorly-lighted and low-heated Sixth Amendment. In the

-15-

middle, the district judge, flowering with rhetoric, defending his reach for a surgically-clean vacuum in which to achieve a fair trial. Had this setting been fiction, it had seemed implausible. It is reality, and stranger than fiction it has escaped the grasp of the majority of this Court.

Let us dispose at the outset of the nonissues that cropped up in this case. First, the voir dire examination of prospective trial jurors is a part of the trial itself. That is too clear for cavil. It is announced by every trial judge in every jury case when at the outset before the jury panel is sworn, he asks of the parties if they are ready for trial. This is a nonissue because, as we shall demonstrate, every United States Supreme Court justice but one has agreed that a trial court has the power to close all or a part of the criminal trial to the public. That holding must include the jury voir dire examination. The Great Falls Tribune itself does not dispute this power, as oral argument revealed.

The second nonissue is whether the pervasive press stories on the purported facts of the crime were misrepresentation. Of course, if the press were culpable, it would be easier to rule, but it is not necessary to look for culpability on the part of the press in a case like this. That is not the issue which determines whether the voir dire examination should be closed. What must be examined is whether the facts of the crime as printed or broadcast, true or false, make it likely that an impartial jury cannot be empaneled in the area from which a jury will be drawn. Thus if the press had misrepresented the facts, but the jury panel atmosphere was not befouled thereby, no right would exist to close the voir dire examination. Conversely, if the reported facts without misrepresentation create an

-16-

atmosphere in which a fair jury cannot be found, defendant's right to a fair trial would require some action by the District Court to ensure a fair trial. The permeating overriding query remains: did the press stories prevent a fair impartial jury? If yes, the district judge acted properly and constitutionally; if not, he acted improperly and unconstitutionally.

The third nonissue relates to the fact that when the District Court announced that he was closing the proceedings to the press (as he did on a previous occasion in the same circumstances) the reporter left the room without objection. We would hold, and Gannett Co., Inc. v. DePasquale (1979), _____ U.S. _____, 99 S.Ct. 2898, 61 L.Ed.2d 608, does hold that the lack of objection by the reporter is not binding on the press or the publisher of the paper and properly so, for it is not within the ostensible authority of a reporter to waive First Amendment rights of his newspaper unless specifically authorized.

Since the Great Falls Tribune has granted in oral argument, whether one is considering the federal or the state constitution, that a District Court does have the power under proper circumstances to close all or a part of the criminal trial, the real issue of the case boils down merely to a difference of opinion as to whether such proper circumstances exist: the Tribune is of the opinion that its coverage is truthful, nonsensational, and not overdone; therefore, it cannot be excluded from voir dire examination even if press coverage did create an unfavorable jury climate for the defendant. The trial judge is of the opinion that the facts have been misrepresented in the press, overemphasized, and unabatedly published; that the demands of the

-17-

constitution, state or federal, for a fair trial in this case require two things: (1) individual examination of prospective jurors outside the presence of the rest of the panel; and, (2) exclusion of the press from such individual voir dire examination to preserve its sanctity.

Which opinion does the record in this case support? Clearly, the district judge. At least 70 exhibits of Tribune articles and television scripts, all in the Great Falls area, show a repeating pattern of recitation that the defendant is charged with raping and killing a 69 year old woman on April 21, 1978. Some articles report her body was found with a knife protruding from her chest. Others state that the defendant, following the crime engaged the police in a high speed auto chase (it is on this point that the district judge charges misrepresentation) that ended when his auto crashed and overturned, injuring him to his present condition. The articles have continued unabatedly in the paper and on television to the time of the trial itself, and even through the period while the matter has been before this Court. The publications, in time-span, volume, and modes of media, exceed by far the publications described by Justice Blackmun in Gannett. Moreover, at the hearing before the district judge requested by the Tribune and granted by us, a psychologist testified that individual examination of trial jurors and voir dire presented the best chance for honest, candid, complete answers from jury candidates. Ordinarily press coverage of such private individual examinations would destroy their objective. Against this impressive array of pervasive jury-contaminating influences, the Tribune offered not one smidgen of evidence in the hearing it had requested.

-18-

Based on the record before us, the district judge made findings and conclusions for submission to us. In a matter of this constitutional weight, this Court need not surrender to the discretion of the District Court the ultimate power of findings of fact that ordinarily would be accorded under Rule 52, M.R.Civ.P. (identical to Rule 52, F.R.Civ.P.). Especially is this true in an original proceedings in this Court, such as this case. But we owe, in courtesy to the District Court, some logical and detailed explanation why his findings are overruled by us on a record such as this. He is after all at the scene of the trial, with a feel for what is taking place in the case he is supervising. He has the experience now of the voir dire examination of some 30 jury panel members. His opinion is entitled to a good deal of weight, in the light of his record as a trial judge.

The Tribune argues nonetheless that the record here of prejudice is deficient; that no affidavit has been filed by persons claiming they have been prejudiced by the press coverage; that the District Court has merely assumed prejudice; and that this Court has held that a juror with a pre-formed opinion may yet serve as a juror if he testifies that he can set aside the prejudice and decide upon the evidence of the case. We could answer that 10 of the 30 plus persons who have been examined have said they are indeed prejudiced and have been excused for cause. That is not the kind of response we should make however, because it does not really meet the true legal issue in the case.

The Tribune would have us adopt as a prevailing rule that the test of a befouled jury atmosphere is the same as that applied to determine the impartiality of a jury candidate. Not so. In the dissent in Gannett upon which the

-19-

_Tribune_ so strongly relies, Justice Blackmun set out a three-fold test for this type of case which should be determinative. It is a test we could adopt here, and if adopted, we would perforce support the district judge and act perfectly in accordance with the state and federal constitutions.

The _Gannett_ case (Gannett Co., Inc. v. DePasquale (1979), _____ U.S. _____, 99 S.Ct. 2898, 61 L.Ed.2d 608) is the measuring stick on/our <sup>what</sup> decision should be here. It is recent, it is on all-fours, and we have written comment by at least 4 of the 9 Supreme Court justices on the matter. Even without agreeing with the majority in _Gannett_, one can see in this case that Judge Coder met the minimum but more strict test for closure that the minority in _Gannett_ postulated. We will examine _Gannett_ in detail to demonstrate this.

The facts in _Gannett_, when compared with those of Austad, show that the Austad case presents a far more compelling reason for the closure of the voir dire examination.

_Gannett_ involved three defendants, two men and an unidentified woman, who were charged in Seneca County, New York, with the crimes of second degree murder, robbery and grand larceny, the woman being indicted only on the count of grand larceny. It appears that the victim, Wayne Clapp, had disappeared while on a boat ride with the defendants on Lake Seneca. Shots had been heard, and bullet holes found in the boat which indicated that Clapp has been the victim of foul play. There were 14 news articles covering the events from July 20 to August 6 of the year in question, reported by two newspapers owned by Gannett, the _Democrat And Chronicle_, the morning paper, and the _Times-Union_, the evening paper. Some of the fourteen stories were iden-

-20-

tical in the two papers. Public interest in the case was aroused because the State was proposing to try the defendants without having found the body of the victim. From Justice Blackmun's dissent (61 L.Ed.2d at 639) we learn that from 90 days preceding the hearing on a motion to suppress confessions, there were no publications. It also appears that the stories consisted entirely of straightforward reporting of the investigation, arrests, and charges; no "editorializing" and nothing that a fair-minded person could describe as sensational journalism. There was one photograph. The headlines were factual; nothing indicates that the stories were placed on the page within the paper so as to play up the murder investigation. The stories were relatively brief, appeared only in connection with each development of the investigation, and gave no indication of being published to sustain popular interest in the case.

At the hearing on the motion to suppress the confessions, defense counsel moved to exclude the press from the hearings. The district attorney did not object and the court forthwith entered a closure order. Those are the facts in Gannett.

For the purpose of this discussion on the Austad case, we may concede that the articles appear to be straightforward reporting of the facts surrounding the investigation, arrest and charges against Austad. There does not appear to be any attempt to "editorialize" or to enter into sensational journalism; the stories are fairly placed in the successive issues of the Tribune, the headlines are factual, the stories relatively brief. Nearly every time, for reference, the stories reflect that Austad is charged with the rape-murder of Mabel Wald, age 69. We have mentioned other items appearing in the Tribune stories.

-21-

In addition to the _Tribune_ stories, there was the television news coverage of which scripts have been supplied in this record. Nothing in the _Gannett_ case shows us what the television coverage was as to the Clapp murder. The television coverage of the Austad case continued in much the same manner as the _Tribune_ coverage, reporting each succeeding development in the investigation, arrest, arraignment and prospective trial of Austad.

The pervasiveness of the publications is greater in Austad than it was in _Gannett_. We find from _Gannett_ that the two newspapers in question are published in Rochester, Monroe County, New York, 40 miles from the Seneca County line. The circulation of the newspapers is primarily in Monroe County. There are subscribers however, in Seneca County. In 1976, when the case arose, the _Democrat And Chronicle_ had a Seneca County daily circulation of 1,022 and the Sunday circulation 1,532. The _Times-Union_ published only a daily edition and had only one subscriber in Seneca County. Seneca County's 1976 population was set by the Bureau of Census at 34,000. It appears from a footnote that the only record offered in the _Gannett_ case related to the publications that appeared in these two newspapers. There was nothing about the television coverage or other newspapers in Seneca County at the time.

Compare that with the Austad case. The _Great Falls Tribune_ is the single daily newspaper published in Cascade County. Its reported daily circulation is approximately 45,000 though it must be admitted that a substantial portion of its circulation goes outside of Cascade County. However, the _Tribune_ enjoys a considerable saturation of the households in Cascade County. The County itself had a 1970

population of 81,804 persons and an estimated January 1, 1979 population of 85,100 persons. Seven radio stations operate in Great Falls, 3 F.M. and 4 A.M. There are two television stations also broadcasting in Great Falls.

On a comparable basis, therefore, from what appears in Gannett, and what we see in Austad, the press coverage of the incident in Austad was greater and more pervasive and reached more potential jurors. Added to this conclusion is the fact that in Gannett, as Justice Blackmun pointed out, the publication was not unabated, there being 90 days of no publication between the last newspaper article and the hearing on the motion to suppress. Here in Austad, the publication has continued unabated and the proceedings of the trial are being reported even now. We do not decry this continuous publication of facts that the public has a legitimate interest to receive; we simply state that the publications have occurred for the purpose of showing the background facing Judge Coder when he decided that to obtain a fair jury, he had to close the voir dire examination.

The justices making up the majority of the court in Gannett were Stewart, who delivered the opinion of the Court, with concurring opinions by Burger, Powell and Rehnquist, and Stevens who joined the principal opinion. The dissenting opinion was written by Blackmun, and Brennan, White and Marshall joined in the dissent which by the way also concurred in part with the majority.

There is no doubt that the majority sustains the right of a trial court to take protective measures to insure a fair trial. The majority said:

> "This court has long recognized that adverse
> publicity can endanger the ability of a
> defendant to receive a fair trial. [Citing
> cases.] To safeguard the due process rights

-23-

of the accused, a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity. [Citing a case.] And because of the constitution's pervasive concern for those due process rights, a trial judge may surely take protective measures even when they are not strictly and inescapably necessary." 99 S.Ct. at 2904, 61 L.Ed.2d at 620.

The majority in Gannett then went on to examine the constitutional claim that the press had a right of access as a part of the public to criminal trials at any stage of the proceedings. The majority found that the provisions of the Sixth Amendment giving to the defendant a "right to a speedy and public trial by an impartial jury" is for the benefit of the defendant and there is not the slightest suggestion that there is any correlative right in members of the public to insist upon a public trial. It agreed that a defendant does not have the right to command a private trial but settled on the issue that members of the public do not have an enforceable right to a public trial that could be asserted independently of the parties to the litigation. 99 S.Ct. at 2906, 61 L.Ed.2d at 624. It further found that there was no common law right on the part of the public to attend the criminal trial and that the history of the common law demonstrated only the existence of a common law rule of open, civil and criminal proceedings. 99 S.Ct. at 2908, 61 L.Ed.2d at 624. It then went on to find that the Sixth and Fourteenth Amendments to the Constitution do not grant any right to attend such pretrial proceedings which as were before the Court in Gannett. 99 S.Ct. at 2911, 61 L.Ed.2d at 628. Finally, in examining the First and Fourteenth Amendments, it found no constitutional impediment in those amendments because the press at any rate would eventually have the right to access to a transcript and further because the

denial of access was only temporary. 99 S.Ct. at 2912, 61 L.Ed.2d at 629.

The concurring opinions are of interest. Chief Justice Burger, in concurring, emphasized that the motion to suppress evidence was not a trial, but a pretrial proceedings. For that reason, we do not count him as supporting the proposition of the majority that trial proceedings in any event may be closed by a court without violating federal constitutional rights.

Justice Powell, in concurring, set the question as we believe it should be posed:

> ". . . The question for the trial court,
> therefore, in considering a motion to close
> a pretrial suppression hearing is whether
> a fair trial for the defendant is likely
> to be jeopardized by publicity, if members
> of the press and public are present and free
> to report prejudicial evidence that will not
> be presented to the jury." 99 S.Ct. at 2916,
> 61 L.Ed.2d at 634.

Justice Rehnquist, in his concurring opinion, cautioned that there is no set procedure to be employed by a trial court to determine whether or not a part of the trial should be closed. He said:

> ". . . To the contrary, in my view and, I
> think, in the view of a majority of this
> Court, the lower courts are under no con-
> stitutional constraint either to accept or
> reject those procedures. They remain, in
> the best tradition of our federal system, free
> to determine for themselves the question whether
> to open or close the proceeding. Hopefully,
> they will decide the question by accommodating
> competing interests in a judicious manner. But
> so far as the Constitution is concerned, the
> question is for them, not us, to resolve." 99
> S.Ct. at 2918-19, 61 L.Ed.2d at 637-38.

We advert now to the finding of Judge Coder in Austad which illustrates why he reached the same conclusion as did the majority in Gannett:

"The evidence submitted to the court in support of defense motions to control pretrial publicity, change of place of trial, sequestration, continuance and related matters indicated, among other things, that the publicity has been substantial; that it or other portions of it originated from the prosecution and police; that it discloses evidence not generally known to the public; that it discloses the accused's prior criminal record, and speculates on his involvement in similar criminal activities; further that such publicity contains material misrepresentations of known facts; that such misrepresentations by the very nature are highly prejudicial and by the very repetition and continued republication, up to and including the time of the jury selection, can only be viewed by an attempt to influence the public and prospective jurors regarding the guilt of the accused Austad." Findings, XXII(1).

If Justice Rehnquist is correct in his view of the majority of the United States Supreme Court, Judge Coder was under no constitutional constraint either to have further hearings on the matter or to look to this Court for guidance; he was "free to determine for [himself] the question [of] whether to open or close the proceeding". 99 S.Ct. at 2919, 61 L.Ed.2d at 638.

The foregoing demonstrates that under the majority view in Gannett, the order of Judge Coder closing the voir dire examination in this case should have been sustained. We will now demonstrate that even under the view of the minority in the Gannett case, he would likewise be sustained.

Justice Blackmun, writing for the dissenting justices, disagreed with the majority in that he found that the public trial provisions of the Sixth Amendment provided a right of access to the public to trials. He saw little difference in a pretrial suppression hearing and the trial itself for the purpose of the Sixth Amendment. 99 S.Ct. at 2934, 61 L.Ed.2d at 657. Nonetheless, he saw that trial courts in certain circumstances must have the right to close trials to the public. He said:

-26-

". . . Because of the importance we attach to a fair trial, it is clear that whatever restrictions on access the Sixth Amendment may prohibit in another context, it does not prevent a trial court from restricting access to a pretrial suppression hearing where such restriction is necessary in order to insure that a defendant not be denied a fair trial as a result of prejudicial publicity flowing from that hearing [citing a case]." 99 S.Ct. at 2936, 61 L.Ed.2d at 659.

Justice Blackmun then proposed a three-fold test to support a finding that the fair trial right of a defendant would be irreparably damaged if the proceeding were conducted in public. Under that test, the accused would establish:

"First, he should provide an adequate basis to support a finding that there is a substantial probability that irreparable damage to his fair trial right will result from conducting the proceeding in public. This showing will depend on the facts. . .

"Second, the accused should show a substantial probability that alternatives to closure will not protect adequately his right to a fair trial. One may suggest numerous alternatives, but I think the following should be considered: continuance, severance, change of venue, change of venire, voir dire, peremptory challenges, sequestration, and admonition of the jury. . .

". . .

"Third, the accused should demonstrate that there is a substantial probability that closure will be effective in protecting against the perceived harm. . .

". . .

"If, after considering the essential factors, the trial court determines that the accused has carried his burden of establishing that closure is necessary, the Sixth Amendment is no barrier to reasonable restrictions on public access designed to meet that need, any restrictions imposed, however, should extend no further than the circumstances reasonably require. . ." (Emphasis added.) 99 S.Ct. at 2937-39, 61 L.Ed.2d at 660-62.

Judge Coder has met the tests proposed by the minority in Gannett. Having determined that the adverse publicity

was prejudicial, he considered the alternatives. He examined the possibility of sequestration and determined it would be necessary to sequester 75 to 100 at the outset. He calculated the sequestration of 75 jurors would cost the county $3,225 per day and projected a prospective cost for a three week trial of $32,000 simply for sequestration. On the basis of cost, the logistical problems involved, and the unconscionable burden on the prospective jurors that would be called for in sequestration, he discarded that as a possibility. He next looked at the possibility of a change of venue. The law requires the removal to a county not adjoining the county in which the crime was committed. Here he had a defendant confined to a wheelchair who required daily assistance to get to and from the proceedings, and required help in the performance of the simplest physical functions. Again, the trial could only be conducted for 3-1/2 hours per day because of the defendant's physical condition. Sixty witnesses are listed on the information of which all but two are residents of the Great Falls area. He therefore discarded the possibility of a change of venue. A continuance was out because already 20 months had elapsed since the date of the crime. He therefore determined that individual examination on voir dire was necessary, and that publication of the voir dire would be detrimental to the defendant, saying:

> "By reason of the nature of the offenses charged and the quantity and quality of pretrial publicity the voir dire of the prospective jurors will be extensive, and by necessity will involve examination not only on the grounds for disqualification for cause as enumerated by statute, but also the individual jurors opinions, feelings, biases and prejudice, whether inherent or traumatically induced, anent the offenses charged. That such examination by both the defense and prosecution is unquestionably necessary to the intelligent exercise of their peremptory challenges.

"To expose these jurors, their responses to such
voir dire questions, together with their names
and addresses would have such a chilling effect
on their candor and willingness to appropriately
respond to such questions as to render nugatory
the purposes of individual voir dire."

We submit that the temporary protective measure taken
by the District Court was strictly and inescapably necessary
and would have been supported, even by the minority in
Gannett.

We have demonstrated that whether one agrees with the
minority in Gannett that the Sixth Amendment provides the
public a right to access to a criminal trial, or with the
majority, that there is no such right, the District Court
offended no federal constitutional right of the Tribune
in making its temporary closure order.  However, the Tribune
also contends that under Article II, §9, of the 1972 Montana
Constitution their right to attend the voir dire examination
exists apart from the federal constitution.

Article II, §9, states:

"Section 9.  Right to know.  No person shall
be deprived of the right to examine documents
or to observe the deliberations of all public
bodies or agencies of state government and
its subdivisions, except in cases in which the
demand of individual privacy clearly exceeds
the merits of public disclosure."

If we were to construe Article II, §9 as an absolute
requirement that the courts of this state be open to the
public at all times, we would run afoul even of the minority
opinion in Gannett, which holds that at the least, there
must be a hearing to establish that the closure is strictly
and inescapably necessary.  There is no need to so hold in this
case, however, because the Tribune has conceded in oral
argument that it does not contend that courts may never
close their proceedings to public scrutiny.  Again, it is a

-29-

matter of constitutional balance. The public's right to know, set forth in the Montana Constitution, must in this case, give way to the defendant's federal constitutional right to a fair trial. Indeed, Article II, §9 of the Montana Constitution must be balanced with Article II, §24 of the same constitution which gives an accused a right to a speedy trial "by an impartial jury of the county in which the offense is alleged to have been committed." Implicit in that last constitutional provision is the duty and authority of a court to take such protective measures as may be necessary to insure the accused is given a trial by an impartial jury.

The majority opinion leans heavily on the 1972 Montana Constitution, Article II, Section 9, the "right to know" provision. We are not persuaded that the federal guaranty of a fair trial, a constitutional right accruing to an individual, can be overridden by a state constitutional provision which is at best a declaration of state constitutional policy. The supremacy of the federal Constitution, declared in Article VI and recognized fully by all courts, precludes any intrusion in the guise of state action that would invade or degrade the federal fair trial guaranty. Even if the state constitutional provision is not expressly designed to impair the individual's Sixth Amendment rights, the Supremacy Clause bars that effect where necessary. See as an example, Grimes v. Hoschler (1974), 12 Cal.3d 305, 525 P.2d 65, cert.den. 420 U.S. 973, 95 S.Ct. 1394, 420 U.S. 973.

As members of this Court, and personally, we are committed to the principle of the public's right to know.

However, we cannot concur that such right is absolute, and that it overrides a defendant's right to an impartial jury. We cannot and do not predict the future; but it may well turn out that in the Austad case, this Court has invited disaster, as the district judge stated in his oral argument.

To close, we must remind ourselves that, important as may be the role of the press in keeping citizens informed, it is not in so doing exercising a governmental function. The press is still the Fourth Estate. Its power and right are not on a par with the governmental power and right of the District Court of the Eighth Judicial District, a power derived directly from the citizens through their duly adopted constitution. In all cases where the duty of the press to keep citizens informed collides with the duty of the court to ensure an accused a fair trial, the duty of the court must prevail.

_____
Justice

I concur in the foregoing dissent.

_____
Justice